**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

MARY AUSTIN,                              )
                                          )
            Plaintiff,                    )       CASE NO.    1:07-cv-2112
                                          )
      v.                                  )       MAGISTRATE JUDGE VECCHIARELLI
                                          )
MICHAEL J. ASTRUE,                        )
      Commissioner of Social Security     )       **MEMORANDUM OPINION & ORDER**
                                          )
            Defendant.                    )

Plaintiff, Mary Austin ("Austin"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Austin's applications for a period of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a).  This court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, this court VACATES the decision of the Commissioner and REMANDS the case for further proceedings consistent with this opinion.

I.  Procedural History

Austin filed an application for DIB and SSI on February 13, 2004, alleging disability due to a cracked right knee, a spur in her right heel, arthritis in her feet, and diabetes.  Her application was denied initially and upon reconsideration.  Austin timely requested an

administrative hearing.

Administrative Law Judge Lawrence D. Wheeler ("ALJ") held a hearing on July 13, 2005.  Austin was not represented by counsel at the hearing, and she testified on her own behalf.  Nancy Borgeson testified as a vocational expert ("VE").  The ALJ issued a decision on August 26, 2005 in which he determined that Austin is not disabled.  Austin retained counsel, and counsel requested a review of the ALJ's decision by the Appeals Counsel.  When the Appeals Counsel declined further review on May 15, 2007, the ALJ's decision became the final decision of the Commissioner.

Austin filed an appeal to this court on July 14, 2007.  Austin alleges that (1) the ALJ failed to satisfy his duty to develop the record fully and (2) remand pursuant to sentence six of 42 U.S.C. § 405(g) is required for consideration of new evidence.  The Commissioner denies that the ALJ failed to satisfy his duty to develop the record or that remand is appropriate.

## II.  Evidence

*A.*     *Personal and Vocational Evidence*

Austin was born on June 10, 1944.  She has completed the 10th grade and has past work experience as a sewing machine operator.

*B.*     *Medical Evidence*

Austin completed a disability report as part of her application for benefits.  Transcript ("Tr."), pp. 68-74.  She reported that she worked as a sewing machine operator and stood for eight hours a day.  The job required her to lift ten pounds frequently.  According to Austin, she fell at work on June 1, 2001 and cracked her right knee.  Later, she was laid off because work slowed down at her job.

2

Austin also completed a Symptoms Report as part of her application.  Tr. at 95-98.
She reported arthritis in her feet that made it impossible to stand for very long and pain that
spreads to her fingers.  She also reported that she had bad days seven days a week.

On April 23, 2002, Jean Langue, M.D., a physician at the Cleveland Heights Medical
Center, diagnosed Austin as suffering from severe arthritis in both hands.  Tr. at 230-32.
Dr. Langue found that fingers in both hands were slightly and permanently curled due to
arthritis.  She also  diagnosed Austin as suffering from diabetes mellitus, hyperglycemia
due to poor glycemic control, and hypercholesterolemia.  Dr. Langue prescribed heat,
Tylenol, massage, exercise, and glucosamine and chondroitin.

Mark A. Hardy, D.P.M., examined Austin's feet on October 6, 2003.  Tr. at 210-11.
He found nonreducible deformities in the form of digital contractions in both feet.  Austin
reported experiencing occasional tingling in both feet for the past two years and that this
had been getting worse.

Austin appeared at the Cleveland Heights Medical Center on January 8, 2004
complaining of pain and swelling in her right ankle.  Tr. at 208.  The examining physician
found slight traces of edema and mild tenderness to palpation in that ankle.  An x-ray
revealed degenerative changes in the talotibulial and talofibular joints, a spur on the heel,
and a pathology of the attachment of the ligament and bone on the side.  Tr. at 106.

In February 2004, a mammogram revealed a ductal carcinoma in the left breast.  Tr.
at 203-04.  Austin underwent a partial mastectomy on March 3, 2004, followed by at least
four months of chemotherapy.  Tr. at 190-91, 195, 110-82.

On March 15, 2004 x-rays revealed mild degenerative changes in the medial
compartment, lateral compartment, and pateliofemoral joints of both knees. Tr. at 106A-07.

3

There was slightly greater degeneration in the right knee.

Austin complained of swelling in her feet on May 14, 2004 and June 4, 2004.  Tr. at 162, 147.  Examinations on May 14, 2004 and June 11, 2004 detected edema in both feet. Tr. at 162, 131.

On May 4, 2004, E.N. Perencevich, D.O., completed a Residual Functional Capacity Assessment of Austin for the Bureau of Disability Determinations.  Tr. at 236-40.  Dr. Perencevich opined that Austin could lift 20 pounds occasionally and 10 pounds frequently, could stand or walk for 6 hours in an eight-hour workday, could sit for 6 hours in an eight-hour workday, and was unlimited in her ability to push or pull.  In citing the causes of Austin's exertional limitations, Dr. Perencevich noted Austin's breast cancer and chemotherapy/radiation, diabetes, and degenerative changes in the knees and ankles.  The doctor did not mention any problems with Austin's feet.  Dr. Perencevich also opined that Austin should never climb ladders or balance; could occasionally climb stairs, kneel, crouch, or crawl; and could frequently stoop.  The doctor also asserted that Austin should avoid concentrated exposure to vibrations.  Dr. Perencevich found no other limitations.  Dr. Perencevich noted that there was no treating or examining source's evaluation of Austin's physical capacities in the record.  A reviewer confirmed Dr. Perencevich's assessment on August 19, 2004.

C.      *Hearing testimony*

Austin appeared at her hearing on July 13, 2005 without an attorney.  At the beginning of the hearing, the following colloquy occurred between Austin and the ALJ:

> ALJ:  You understand you have [the right to an attorney], is that correct?
>
> CLMT:  Yes.

4

ALJ:  Okay. If you would like to have time to get someone to represent you, I can have this case delayed to allow you time to do that.  Is that what you would like to do?

CLMT:  How long would that take?

ALJ:  I don't know.  I come in here from California.  I'm going back in September and October.  If the case stays with me, it would be put for one of those days.  It depends on who you get and being available, their being available for a time for the judge to do the case.

CLMT:  Okay.

ALJ:  If you want a hearing, if you a [sic] representative, then you might want to consider taking the time to get one.  If you don't, you can waive your right to representation and we can do the hearing today.  But that doesn't mean, you know, I'm not going to say that going without a representative or going with one is good for you.

CLMT:  Oh!

ALJ:  You have to decide yourself.  I'm not going to tell you which way to go.

CLMT:  Okay.

ALJ:  But it is an important right for you to decide whether you want to give it up.

CLMT:  No.

ALJ:  If you don't want to give it up, that's fine.

CLMT:  No.

ALJ:  There's no stigma attached.  I will have the case postponed.  We call it continued.  And you will be notified for the next time your case will be held.  In the meantime, you must act as quickly as you can to find some to [sic] take your case, to avoid further delay.  Because if you wait until just before next time it's scheduled, they may say I'm not available that day and it may have to be delayed even further.  You understand?

CLMT:  Okay.  Well now, can I go on with it today?

ALJ:  You can do it, but you can only do it if you tell me, I understand I have the right to representation and I know that I can have this case postponed, but I

5

want to give up that right and proceed or go ahead today.  Now, you decide what you want to do.

CLMT:  I want to go today.

ALJ:  Okay.  Before that, there's one more thing I want to do in that area which is, we sent you a letter.  You are at **[address]** , is that right?

CLMT:  Right.

ALJ:  Okay. On October 7, '04, we sent you a letter, wherein on the first page we stated in part you may choose to be represented by a lawyer or other person. A representative can help you get evidence, prepare for the hearing and to present your case at the hearing.  It also says some private lawyers charge a fee only if you receive benefits.  In other words, if you don't win, you don't pay anything.  You don't owe anything.  Some organizations may be able to represent you free of charge. Excuse me.  Your representative may not charge or receive any fee unless we approve it first.  And then a leaflet entitled "Social Security and Your Right to Representation" should have been enclosed with that letter.  Do you remember getting that letter?

CLMT:  I don't remember, because I've been sick.  I can't think.

ALJ:  Well, that's essentially what it says, is what we just got through talking about.  Okay?

CLMT:  Oh!

ALJ:  You have a right to be represented; you can get this case postponed if you want to get representation; or you can give up your right and the case can be done today, without representation.

CLMT:  Okay.  Well, I did want it to be did today.

ALJ:  You have to speak louder.

CLMT:  Today, I want it to be did today.

ALJ:  Are you waiving your right to representation?

CLMT:  Yes.

ALJ:  You don't seem sure.

CLMT:  Well, I can't under -- you mean?  What you say now?  Say that again.

6

ALJ:  If you want to go ahead today, you have to tell me that you give up your right to an attorney.

CLMT:  Okay.  Well, I give up my right to have --

ALJ:  Is that what you want?

CLMT:  Yes, that's what I want.

ALJ:  Okay.  Did you have an opportunity to look at your exhibit file?  This is the exhibit file.  Did you look at that?

CLMT:  No.  I just got that when I walked in.

ALJ:  Right.

CLMT:  Uh-huh.

ALJ:  Did you go through it at all?

CLMT:  I, no.

ALJ:  Well, see that was your chance to look at it.  That's why, you know, you may want to re-think whether you want representation.  I don't have time to stop now --

CLMT:  Okay.

ALJ:  And have you go through this.  Your attorney, if you had one, would be familiar with what's in here and argue your case on your behalf.  If you don't have one, normally people, everyone has a right to look at their file, but I have time to have you take it and look at it now, if you haven't looked at it already.  And once again I will tell you, if you have not looked at this, if you feel that you would be better served by getting someone to represent you who will understand this and be able to argue for you in this hearing, I will have it continued for you to get a chance to get someone.

CLMT:  Okay.

ALJ:  So, I will ask you one more time, do you want to go ahead, even though you have not looked at your exhibit file and don't have a representative o [sic] do you want time to get somebody to represent you who will get familiar with your case file?

CLMT:  I want to go ahead.

7

ALJ:  I'm sorry?

CLMT:  I want to go ahead with it.

ALJ:  Okay.

Tr. at 392-96.  Shortly afterward, the following exchange occurred:

ALJ:  . . . Do you have any objection to my receiving your exhibits into the record?  Do you know what object means?

CLMT:  Say what now?

ALJ:  Do you object to my receiving your exhibits into the record?  Do you know what object means?

CLMT:  What do you mean by that?

ALJ:  Do you, are there any exhibits that you feel I should not receive as part of this record?  Now you haven't looked at them.  You see, there's the problem.

CLMT:  No.

ALJ:  But I can't proceed without them; meaning I cannot go ahead without the documents to allow me to consider your case.  So tell me if you have, if you don't want me to receive these exhibits or not.

CLMT:  Yes.

ALJ:  You want me to receive them or not?

CLMT:  Now what do you mean by receive them?

ALJ:  I really think you should consider getting an attorney.  You can't, I can't do this hearing having to explain to you every single word all the way through the process.  I am trying to find out from you, to tell me now, do you have an objection, are you opposed, are you against my receiving the exhibits in your record, in your file, into the record of this case?

CLMT:  No.

ALJ:  Of this hearing?

CLMT:  No.

8

ALJ:  Yes or no?

CLMT:  No.

ALJ:  Okay.  I'll give you one last time, do you want it postponed to get a lawyer or not?

CLMT:  Okay.  But do I need a lawyer?

ALJ:  I'm not going to tell you if you do or not.  You obviously should know that.  You don't know what's going on.  You don't even know what's in your exhibit file.  But if you want to go ahead, I will.  But I'm giving you another chance to tell me if you --

CLMT:  Well go ahead without the lawyer.

Tr. at 398-99.

The hearing further deteriorated after these exchanges.  Austin testified that she had worked making Dobie pads:

Q.  . . . Did that work require that you sit at a table or workstation, operating an electric sewing machine?

A.  I could sit and stop, stand.

Q.  Okay.  Was that at a workstation with an electric sewing machine?

A.  Yeah.  It's a machine I could sit at and put the pads on there.

Q.  Right.

A.  Uh-huh.

Q.  How would you do it standing?  Would you have to lean over to do it?

A.  No.  I had to sit down and make them.

Q.  Okay.

A.  But when I sew them on the machine, I have to put them on the machine.

Q.  What would you do standing?

9

A.  Well, when I stand I run the machine.  Then I put the pads on there, on the machine, standing up.

Q.  Okay.  You can do it either way?

A.  Yeah.

Q.  Standing or sitting?

A.  I could run the machine, I put the pads on there.  But when I'm sitting down, I had to make them.

Q.  What's the difference between putting the pads on the machine and making them?  That's --

A.  Well, if I sit down, I have to make the pads.

Q.  How do you make the pads?

A.  Well, we have some like this and you have to run them up there and put the sock down in there, what we call.

ALJ:  Okay.  You understand?

VE:  I'm sorry.  I think so.

ALJ:  Right.

Tr. at 401-02.

The ALJ then tried to determine if Austin was currently capable of performing her past work:

Q.  . . . [W]hy were you laid off?  Because you didn't have enough work?

A.  Yeah, the job that I was doing.  The whole plant didn't close, just --

Q.  Okay.

A.  The work , the job I was doing went out.

Q.  Okay.  If you had not been laid off, if they didn't close, could you have kept doing it?

10

A.  Yeah, if I hadn't been laid off.

Q.  Even today?

A.  Yes.  Yes.

Q.  Okay then, tell me why you think you're eligible for the benefit you seek if as you just told me, you could still be doing that work?

A.  Yeah, if I had see, I had breast cancer.

Q.  I understand that.

A.  In 2004.

Q.  I understand.  Do you have it now?

A.  Well, they removed the lump.

Q.  Right.

A.  Uh-huh.  So I took the chemo and radiation.

Q.  Right.  And that's past, right?

A.  Yeah.  And so, I was sick from the chemo.  I stayed sick[.]

Q.  For a while?

A.  For a while from the chemo.  I was weak.

Q.  For how long?

A.  About, I guess about three months, six months.

Q.  Okay.

A.  From the chemo.  Because I had to take the chemo and the radiation. And that made me sick.

Q.  I understand.

A.  Yes.

Q.  So three or four months, you said?

11

A.  Yes.

Q.  Okay.

A.  And I'm a diabetic.  I had to have my toe amputated.

Q.  Right.

A.  And I had to go to the hospital for a month.  I stayed two weeks in the hospital, two weeks in the rehab.  When I came out the hospital, I had to do the antibiotic through my vein.

Q.  Do what?

A.  Had to take the antibiotic through my vein.  They put a pin in my arm and I had to do that at home.  I had to give myself the antibiotic for five weeks.

Q.  So within less than a year, the chemo/radiation is done, the toe is done, you've gone through all that, right?

A.  Yeah, I'm going through my toe now.  I had it amputated March 31st.

Q.  What?

A.  So, I had my toe amputated March 31st.

Q.  Of this year?

A.  Yes.

Q.  Okay.

A.  So, I got to go back to the doctor tomorrow to let him check it.  I have [INAUDIBLE].

Q.  Okay.  That was four months ago?

A.  Yeah.

Q.  Approximately.  So other than that, is there any other reason why you think you couldn't work?

A.  Well, because I get tired.  I can't stand up long.

Q.  You can't stand up long?

12

A.  No.  I get tired.

Q.  Well, so you had a job sitting down?

A.  Pardon me?

Q.  You had a job sitting down?

A.  I haven't had a job since 2001.

Q.  I understand that.  That job was a sitting down job, right?

A.  Yeah, that was a sitting down job.

Q.  So why, if you had that job that, you said you could still be doing it, right?

A.  Well, if I wasn't sick.  But right now, I'm sick, you know?

Q.  But not for more than a few months?

A.  Well, I was sick for, yeah, a few months, because I had the breast cancer and then my toe was amputated.

Q.  So when was the breast cancer, lumpectomy?  When was that?

A.  That was 2004.

Q.  Okay.

A.  Uh-huh.

Q.  Now you have a toe removed and you're going through that?

A.  I had a toe removed, yes.  I've been in the hospital.

Q.  Okay.  So I still don't understand.  You said you could still be doing that work today; had to have some time off for the toe, you had to have some time off for the breast cancer and lumpectomy?

A.  Yeah.  But I can't work now, because like I said, I get tired.  I can't stand up long.

Q.  At a job like the one you did, you said earlier you could still do that job if you weren't laid.  [sic]  You'd still be doing it.  That's what you said?

13

A.  Yeah, I said if I wasn't sick, you know?

Q.  No, you didn't.  You said if you still had that, if you weren't laid off, you'd still be doing it today.  I accept that you would not have been able to do it while you were having your surgery.

A.  Yeah.

Q.  And recovery.

A.  Uh-huh.

Q.  But other than that, you could still be doing that job, right?

A.  Well, if I wasn't sick, you know?

Tr. at 402-06.  The ALJ tried to explain to Austin that she couldn't qualify for the benefits she sought just because she had lost her job, that she had to show that she was incapable of performing that job or other jobs.

Q.  . . . People don't qualify because they can't get hired.  They only qualify if it's determined that if they were hired, if they did, were offered a job, they would not be able to perform it for physical or mental reasons, or both.

A.  Well see, I wasn't able to work after that.

Q.  Ma'am you told me, you stopped working because they closed down.  That's not a qualifying reason.  Then you had a problem with your toe and the breast cancer involving less than a full year.  And you told me if you still had the job, if you were not laid off, you would still be doing it.  You don't qualify.

A.  Okay.  So that mean, if you know I got laid off in 2001, if I hadn't got laid off, I would still have been working?

Q.  Right.

A.  But I got sick after that.

Q.  Okay.

A.  And I couldn't work.

Q.  For during that time you were sick?

14

A.  Yeah.

Q.  But that wasn't more than 12 months.  People get sick and recover and go back to work.

A.  That's true, but I couldn't go because, because I was sick.

Q.  All right.  Tell me anything else you think I should know before I go to the vocational expert. . . .

Tr. at 407-08.

The ALJ turned to questioning Austin about her daily activities.  Austin said that she cooked, did grocery shopping, laundered, sometimes vacuumed, dusted, cleaned the bathroom, and sometimes watched TV.  She denied going out for pleasure, explaining that she did not have the energy for that.  Austin also testified that she has never driven a car.

The ALJ then questioned the VE.  The VE opined that it appeared that Austin had performed her work as a sewing machine operator at the sedentary level.  The ALJ posed the following hypothetical to the VE:

Q.  . . . [T]he individual is 61; 10 years of school; same work experience claimant had; limited to light exertion; further limited to no climbing ladders, ropes or scaffolds; no work that requires balancing or stooping; work that requires no more than occasional climbing of ramps and stairs; kneeling, crouching and crawling. With that profile, would the past relevant work hit?

A.  Yes.

Q.  All right.

Tr. at 411.

The ALJ had one last question before closing the hearing:

Q.  I have one question for you, Ms. Austin, do you use any device to assist you with walking?

A.  The what?

15

Q.  Do you have any device to assist you with walking?  Do you use a cane?

A.  I have a walker.

Q.  Where is it?

A.  I have a walker.  I left it, I left it in there.

[INAUDIBLE].

Q.  Outside the door?

A.  Yeah.

Q.  Now, is that because you had your toe surgery recently?

A.  Yeah, because he told me if I feel tired, to use my walker.

Tr. at 411-12.  The ALJ  closed the hearing.

D.    *Appeal to the Appeals Counsel*

After receiving notification of the ALJ's unfavorable decision, Austin secured the assistance of counsel.  Austin filed, through counsel, an appeal of the ALJ's decision to the Appeals Counsel.  Austin completed a Disability Report as part of her appeal.  Tr. at 76-88. In that report, she stated that she had arthritis in her hands and feet, had an amputated and infected toe, limped because of pain in her feet, was tired because of her chemotherapy treatments, was sick and weak, and had trouble with memory.  She also stated that she was able to cook, clean, and bathe herself but that she did not go out much because she was too tired.  Austin included additional documentation of her medical conditions with her appeal, as described below.

Records from Kaiser Permanente from August 24, 2004 through October 12, 2005 documented Austin's chemotherapy, an infection in her right toe, a consultation for depression, and radiation treatments.  Tr. at 371-72, 373-74, 381-82, 383-85.  After the

16

amputation of her third toe on her left foot on March 30, 2005, Austin suffered gangrene and osteomyelitis and required hospitalization.  Tr. at 340-57.  Clinical observations on September 26, 2005 noted retinopathy, nephropathy, cataracts, neuropathy, and hyperglycemia.  Tr. at 281.

X-rays of Austin's lumbar and thoracic spine on August 24, 2005 revealed lower lumbar facet degenerative changes, possible minimal spondylolysis at L4-5, and mild thoracic degenerative disc disease.  Tr. at 258, 260.

Barry Gordon, M.D., one of Austin's treating physicians, completed a Physical Capacity assessment of Austin on October 15, 2005.  Tr. at 269-70.  Dr. Barry opined that Austin could lift up to 20 pounds occasionally and 10 pounds frequently, could stand or walk for a total of two hours in an eight-hour workday and for one half hour continuously, and could sit without restriction.  Dr. Gordon also asserted that Austin should never climb; should only occasionally balance, stoop, crouch, kneel, or crawl; and should avoid temperature extremes.  He also noted that Austin had been prescribed a cane.

Dr. Hardy completed a Physical Capacity assessment of Austin on October 17, 2005.  Tr. at 272-73.  Dr. Hardy opined that Austin could lift up to 10 pounds occasionally and 10 pounds frequently, could stand or walk for a total of one to three hours in an eight-hour workday and for twenty to thirty minutes continuously, and could sit without restriction.  Dr. Gordon also asserted that Austin should never climb, kneel, or crawl; should only occasionally stoop or crouch; and should avoid chemicals dust, noise, or fumes.  He also noted that Austin had been prescribed a cane, walker, and brace.

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes

17

disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV.  Summary of Commissioner's Decision

In relevant part, the ALJ made the following findings:

18

1.   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.   The claimant has not engaged in substantial gainful activity since June 1, 2001.

3.   The claimant has heart and mental problems, impairments that are "severe" within the meaning of the Regulations but not "severe" enough to meet or medically equal, either singly or in combination one of those impairments listed in Appendix 1, Subpart P, Regulations No. 4.

4.   The claimant's statements concerning her impairments and their impact on her ability to work are not entirely credible in light of the degree of medical treatment required, discrepancies between the claimant's assertions and information contained in the documentary reports, the reports of the treating and examining practitioners, and the medical history.

5.   The claimant has the residual functional capacity to perform a range of light work.

6.   The claimant's medically determinable impairments do not prevent the claimant from performing her past relevant work.

7.   The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision. . . .

Tr. at 20-21.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which

19

a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

VI.  Analysis

Austin claims (1) the ALJ failed to satisfy his duty to develop the record and (2) remand is required for the consideration of new evidence.  The Commissioner denies that the ALJ failed in his duty to develop the record or that remand is required.  Each of Austin's claims shall be examined separately.[1]

A.      *Whether the ALJ failed in his duty to develop the record*

Austin contends that the ALJ failed to develop the record sufficiently despite a duty to do so arising from Austin's *pro se* status and confusion.  The Commissioner denies that the ALJ was on notice to develop the record further.

The Commissioner errs.  The ALJ is charged with the responsibility of ensuring that every claimant receive a full and fair hearing by acting "as an examiner charged with developing the facts."  *Richardson v. Perales*, 402 U.S. 389, 411 (1971).  The ALJ is under a special duty to develop the record when the claimant appears without counsel. *See Lashley v. Secretary of HHS*, 708 F.2d 1048, 1051-52 (6 th Cir. 1983).  This requires that the ALJ "must 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" ' and "must be 'especially diligent in ensuring that favorable as well as

---

[1]   The ALJ's efforts to inform Austin of her right to counsel are commendable. However, the development of this issue is distinct from the ALJ's duty to fully develop the factual and medical record of an unrepresented claimant.

unfavorable facts and circumstances are elicited." ' *Id.* at 1052 (quoting *Gold v. Secretary of HEW,* 463, F.2d 38, 43 (2d Cir. 1972)). The Sixth Circuit has indicated "that it will 'scrutinize the record with care' where the claimant appeared before the administrative law judge without counsel. *See Lashley*, 708 F.2d at 1052 (quoting *Holden v. Califano*, 641 F.2d 405, 408 (6th Cir. 1981)).

Although the ALJ understandably became frustrated in his questioning of Austin, he, nevertheless, failed in his duty to develop the record and to ensure that Austin received a full and fair hearing in four respects. First, the ALJ failed to invest the time and patience necessary to elicit useful information from Austin. A review of the hearing transcript leads any careful reader to the conclusion either that Austin's intelligence is significantly below normal or that Austin has great difficulty understanding others and expressing herself. Among other indicators of such problems, her vocabulary is extremely limited; she has difficulty understanding relatively simple concepts; she repeats herself even when such a response is inappropriate; and she has difficulty ordering and describing sequential processes. The ALJ should have realized relatively quickly that Austin's value as a witness was limited by the extent of her ability to understand the questions asked of her and by her ability formulate a proper response. If nothing else, Austin's statement that she had trouble thinking and memory problems, her repeated failure to understand the ALJ, and the ALJ's and VE's repeated confusion regarding what Austin was saying should have put the ALJ on notice that a great deal of time and patience was necessary to ensure that Austin understood what was being asked of her and to elicit clear and useful information. The ALJ failed in this regard. Austin's testimony occupies a mere ten pages of transcript. Despite repeated instances of mutual misunderstanding between the ALJ and Austin, the few

21

attempts that the ALJ made to reduce that misunderstanding were quickly abandoned.

Second, contradictions in Austin's testimony and between Austin's testimony and the record raise more than a possibility that Austin has difficulty expressing herself precisely enough to eliminate ambiguity. Austin stated both that she had to stand to perform her old job and that her old job was a sitting job; she asserted that she would be doing her job today if she had not been laid off and that she was now unable to do the work because she was sick; and she referred to her job as a sitting job but her disability report stated that she stood for eight hours on the job. There are indications in Austin's testimony that it may be possible to resolve these contradictions by probing them with careful questioning. Austin can be understood to say, for example, that she can sit when she assembles the pads but that she must stand when she sews them. Nevertheless, the VE assumed that Austin performed the work at the sedentary level. Similarly, Austin refers to herself at the hearing as being sick or tired in the past tense and in the present tense when trying to explain her inability to stand for long periods of time. This should have alerted the ALJ to the possibility that Austin suffered from some then-current medical problem and was not only referring to her cancer, cancer treatment, or her toe amputation when talking about her inability to stand for very long.[2] Once on notice that Austin was limited in her ability to understand others and express herself, the ALJ should have done more to cure the ambiguity in Austin's responses.

Third, there were clear indications in the record that Austin suffered from disabilities that the ALJ did not explore at the hearing. Austin's Symptoms Report and

---

[2] Austin also seems to have had difficulty understanding the "if-then" hypothetical posed by the ALJ with regard to her layoff.

underdeveloped testimony suggest arthritic pain and deformity in Austin's feet and hands and difficulty walking and standing.  The ALJ did nothing to develop the record with respect to these issues and made no findings with respect to Austin's arthritis of diabetes.  The ALJ also noted the amputation of Austin's toe but made no investigation of the effect of that amputation on Austin's functional capacity and made no findings relating the  amputation to Austin's ability to work.

Fourth, Dr. Perencevich's Residual Functional Capacity Assessment on which the ALJ relied apparently was based on an incomplete record.  In citing the causes of Austin's exertional limitations, Dr. Perencevich noted Austin's breast cancer and chemotherapy/radiation, diabetes, and degenerative changes in the knees and ankles but did not mention any deformities in Austin's feet or hands.  Dr. Perencevich's report was also written before Austin's amputation of her toe.  The failure to include all of Austin's physical problems in assessing her residual functional capacity makes Dr. Perencevich's assessment of dubious value.

These shortcomings in the hearing make doubtful whether the ALJ properly assessed all of Austin's functional limitations and doubtful the VE's conclusion that Austin's previous job was performed at a sedentary exertional level.  It cannot be said under such circumstances that the ALJ made his decision on a fully developed record.

This court understands the time constraints under which ALJ's labor.  The Fifth Circuit described this problem clearly and sympathetically:

> At the outset, we wish to make it clear that we recognize that under the provisions of the appropriate statutes, the governmental policy is to provide protection to millions of wage earners under varying circumstances, and that when claims of disability arise, the policy strongly favors prompt handling and disposition of the claims.  It is understandable, therefore, that the agency representatives properly

23

wish to avoid unnecessary delays in reaching and deciding these cases, of which there are hundreds of thousands each year. See *Easley v. Finch*, 431 F.2d 1351 (4th Cir. 1970).  We note that in the three cases in which we heard oral arguments in the same sitting of this Court, the hearings before the administrative law judge consumed 30 minutes, 35 minutes, and 51 minutes respectively.  We do not criticize the conduct of the three administrative law judges on the ground that any one of them intended to be unfair or intended to establish a record of the number of cases that would be disposed of in a single day.  Moreover, we recognize that the presence of counsel in these three cases would inevitably have extended the length of the hearings and thus have delayed the disposition of other cases waiting to be tried.  Nevertheless, recognizing that these claimants individually were to be gravely affected in their economic lives for the period of their entitlement, we must consider the hearings in light of some of the requirements normally recognized in deciding cases involving problems of such moment.

It cannot be said that Austin had a full and fair hearing.  For this reason, the case must be remanded to the ALJ.

As the case will be remanded for failure fully to develop the record, the court need not consider the issue of whether new evidence warrants remand.  The ALJ will have an opportunity to consider Austin's new evidence at the time of her second hearing.

VII.  Decision

For the foregoing reasons, the Court VACATES the decision of the Commissioner and REMANDS the case for further proceedings consistent with this opinion.

IT IS SO ORDERED.


s/ Nancy A. Vecchiarelli
U.S. Magistrate Judge

Date: May 6, 2008

24